UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
SANTOS HERNAN MATUTE-CASTRO,                    :
                                                :
                    Petitioner,                 :
                                                :          **OPINION AND ORDER**
        -against-                               :          **15-CV-04568 (DLI)(JO)**
                                                :
JOSSELINNE PAMELA JIMENEZ-ORTIZ,                :
                                                :
                    Respondent.                 :
----------------------------------------------------------------x

**DORA L. IRIZARRY, Chief United States District Judge:**

Santos Hernan Matute-Castro ("Petitioner"), petitions this Court under the International

Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.*, which implements The

Hague Convention on the Civil Aspects of International Child Abduction ("the Hague

Convention" or "Convention"), for an order directing Josselinne Pamela Jimenez-Ortiz

("Respondent") to return their minor son, M.M.J. (the "child"),[1] to Ecuador. *See* (Petition ("Pet."),

Dkt. Entry No. 1.) Respondent moves for summary judgment dismissing the petition. (Resp.'s

Mem. In Supp. of Mot. for Summ. Judgment ("Resp.'s Mem."), Dkt. Entry No. 35-15.) Petitioner

opposes. (Pet.'s Mem. in Opp. to Resp.'s Mot. for Summ. Judgment ("Pet.'s Mem."), Dkt. Entry

No. 37.) For the reasons set for below, Respondent's motion is granted and the petition is denied.

## BACKGROUND

### I.       Undisputed Facts and Petitioner's Failure to Comply with Local Rule 56.1

Local Civil Rule 56.1(a) requires that a party moving for summary judgment include with

the motion a "separate, short and concise statement, in numbered paragraphs, of the material facts

as to which the moving party contends there is no genuine issue to be tried." Rule 56.1(b) also

---

[1] In order to protect the child's identity, the Court will use the child's initials instead of his name pursuant to Federal
Rule of Civil Procedure 5.2.

requires the opposing party to submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried."  If the opposing party fails to controvert a fact set forth in the movant's Rule 56.1 statement, by citing to admissible evidence, that fact is deemed admitted pursuant to the local rule.  *See* Local R. 56.1(c), (d); *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003).

As Respondent correctly notes, Petitioner's 56.1 response fails to comply with the local rule.  Rather than specifically controverting Respondent's factual allegations, by pointing to admissible evidence in the record, the majority of Petitioner's numbered paragraphs simply assert that "genuine issues of fact" exist as to Respondent's factual contentions.  Because Petitioner's denials are conclusory and lack citations to the record, the Court deems the facts in those paragraphs undisputed.  *See Dolan v. Select Portfolio Servicing*, 2016 WL 3512196, at *1 n. 4 (E.D.N.Y. June 22, 2016); *Nassar v. Madera*, 2016 WL 3945689, at *1 n. 2 (S.D.N.Y. July 19, 2016); *Arista Records LLC v. Lime Grp. LLC*, 2011 WL 1641978, at *4 (S.D.N.Y. Apr. 29, 2011) ("Defendants' unsupported denials in its Response to Plaintiffs' Statement of Undisputed Facts cannot, without citation to any evidence in the record, create a genuine issue of fact.").  Nonetheless, the Court also independently has reviewed the record and determined the uncontroverted facts.  *See Giannullo,* 322 F.3d at 140.  Accordingly, the following facts are undisputed unless otherwise noted.

## II.      Relationship Between Petitioner and Respondent

In 2009, Petitioner and Respondent met at a family wedding in Ecuador when Respondent was sixteen years old and Petitioner, who was studying to be a dentist, was in his early twenties.

(Declaration of Josselinne Pamela Jimenez Ortiz, dated July 1, 2016 ("Jimenez Decl.") ¶ 3, Dkt. Entry No. 35-2.) Soon thereafter, they started dating, and, a few months later, Respondent became pregnant. (*Id.* ¶ 4.) In late 2009, Petitioner and Respondent moved into a house owned by Petitioner's parents, and M.M.J. was born in May 2010. (*Id.*) From the outset of their relationship, and later during their marriage, the parties experienced significant discord. (Jimenez Decl. ¶¶ 6-8, 12-14.)

As part of Petitioner's dental studies, he was required to perform mandatory rural training at a remote location in Ecuador. (*Id.* ¶ 9; Ex. 1 to the Declaration of Elise A. Yablonski, dated June 30, 2016, Dep. Tr. of Santos Herman Matute-Castro ("Matute-Castro Dep.") at 28:10-25, Dkt. Entry No. 35-14.) Students were assigned to locations based on a lottery system, and married students could receive assignments closer to their homes. (*Id.* ¶ 9; Matute-Castro Dep. at 29:11-30:11.) Since neither Petitioner nor Respondent wanted Petitioner to receive an assignment location too far from their home, the couple decided to get married. (*Id.* ¶ 9; Matute-Castro Dep. at 30:18-20.) Thus, on March 22, 2012, Petitioner and Respondent were married in a small civil ceremony. (*Id.* ¶ 9; Matute-Castro Dep. at 30:14-15.) Shortly after the wedding, Petitioner was assigned to a rural training program in Jipijapa, Ecuador located approximately eight hours away from their residence. (*Id.* ¶ 10; Matute-Castro Dep. at 33:9-34:22.) From April 1, 2012, to March 31, 2013, Petitioner spent the week in Jipijapa and the weekend at home. (*Id.* ¶ 10; Matute-Castro Dep. at 34:23-35:5.) In early 2013, Petitioner applied to a post graduate program in cosmetic "restoring dentistry" in Bauru, Brazil. (*Id.* ¶ 10; Matute-Castro Dep. at 43:19-44:18.) Petitioner began the program on August 19, 2013, but, as discussed in more detail immediately below, not before Petitioner, Respondent, and their child traveled to New York City. (Matute-Castro Dep. at 44:24-25.)

### III. The July 2013 Trip to New York

Prior to Petitioner's departure to Brazil, Petitioner, Respondent, and the child traveled to New York City for a family vacation. (Jimenez Decl. ¶ 14.) Respondent and the child arrived on July 2, 2013, and planned to stay until August 18, 2013. (*Id.* ¶ 15; Matute-Castro Dep. at 141:24-142:4.) On July 15, Petitioner joined Respondent and the child in New York, where he intended to stay until August 1, 2013. (*Id.* ¶ 15; Matute-Castro Dep. at 143:2.) Near the end of Petitioner's visit, Respondent informed Petitioner that she wanted to remain in New York until her tourist visa expired in December 2013 in order to learn English and because Petitioner would be in Brazil. (*Id.* ¶16; Resp.'s Local Rule 56.1 Statement of Material Facts ("Resp.'s 56.1") ¶ 29, Dkt. Entry No. 35-1.) Petitioner denies that Respondent informed him of her intentions prior to his departure. (Matute-Castro Dep. at 150:22-151:20; Pet.'s Local Rule 56.1 Response to Resp.'s Local Rule 56.1 Statement of Material Facts ("Pet.'s 56.1 Resp.") ¶ 29, Dkt. Entry No. 37-1.) Rather, Petitioner asserts that Respondent notified him of her plan after he had already returned to Ecuador. (Matute-Castro Dep. at 152:3-10.) However, it is undisputed that Respondent and the child did not return to Ecuador on August 18, 2013. (Jimenez Decl. ¶ 16.)

On August 13, 2013, prior to Petitioner's departure for Brazil, Petitioner executed a power of attorney in favor of his father. (Matute-Castro Dep. at 166:8-167:10.) The power of attorney authorized Petitioner's father to seek the return of the child by initiating proceedings in Ecuador. (*Id.*) Petitioner did not inform Respondent that he had executed the document, or that he would seek return of the child. (Jimenez Decl. ¶ 19.)

In December 2013, Respondent learned that Petitioner's father had filed a court proceeding in Ecuador seeking the return of the child. (*Id.* ¶ 19.) That proceeding currently is pending in Ecuador. (Matute-Castro Dep. at 180:9-181:19, 183:11-188:4.) As a result of the filing, and

because she wanted to escape Petitioner's controlling and abusive behavior, Respondent decided not to return to Ecuador in December of 2013. (Jimenez Decl. ¶ 19; Resp.'s 56.1 ¶ 25.) Respondent then applied for and received F-1 student status, which allows her and the child to remain lawfully in the United States while Respondent is enrolled in an education program. (Jimenez Decl. ¶ 26.) Currently, Respondent and the child each hold F-1 status, and she is enrolled in an English language course in Manhattan. (*Id.* ¶¶ 25-26; Resp.'s 56.1 ¶¶ 22-23.) Respondent intended to take the High School Equivalency Examination in July 2016. (*Id.*)

## IV.    The Ecuadorian Divorce Proceeding

In June 2014, Respondent filed for divorce in Ecuador. (Resp.'s 56.1 ¶ 26; Pet.'s 56.1 Resp. ¶ 26.) Petitioner opposed the divorce, and, in September 2015, judgment was entered against Respondent dismissing the proceeding. (Jimenez Decl. ¶ 20.) Respondent appealed the judgment, and, on October 19, 2015, the appellate court reversed the lower court's decision and granted Respondent a divorce. (*Id.*; Resp.'s 56.1 ¶ 27; Pet.'s 56.1 Resp. ¶ 27.) The appellate court stated that, "[T]he relationship between [Petitioner] and [Respondent] ha[d] been experienced by her as an offensive and hostile marriage, devoid of harmony since the home was formed[.]" (Ex. 3 to the Jimenez Decl., Ecuadorian Appeals Court Judgment ("Ecuadorian Judgment") at ¶ 3.3, Dkt. Entry No. 35-3.) Respondent asserts that the appellate court's decision also granted her custody of the child. (Jimenez Decl. ¶ 22; Resp.'s 56.1 ¶ 28.) While Petitioner denies this claim, ("Pet.'s 56.1 Resp. ¶ 28), the appellate court directed that, "[t]he [Child] will remain in the care of his mother." (Ecuadorian Judgment, at "DECISION" paragraph.) However, the appellate court noted that Petitioner's request to return the child to Ecuador was before "'Court K' of the Judicial Unit for Families, Women, Children, and Adolescents," and that "Court K" should "issue the appropriate ruling." (*Id.*) Additionally, the appellate court ordered that Petitioner pay $93 in child support

from June 2014 to January 2015, and $125 per month thereafter.  (Ecuadorian Judgment, at "DECISION" paragraph.)  Petitioner currently is making the child support payments.  (Resp.'s 56.1 ¶ 21; Pet.'s 56.1 Resp. ¶ 21.)

**V.    The Child's Life in New York Since July 2013**

Since arriving in New York in 2013, Respondent and the child have resided with Respondent's mother, father, younger sister A.J.,[2] and a great uncle named Sergio in a house in Queens, New York.  (Resp.'s 56.1 ¶ 3; Pet.'s 56.1 Resp. ¶ 3.)   Respondent's parents purchased the house in 2007.  (Declaration of Beatriz Jimenez, dated June 30, 2016 ("B. Jimenez Decl.") ¶ 2, Dkt. Entry No. 35-5.)  Petitioner disputes the purchase date of the home by offering documents showing that Respondent's parents did not own the home until 2013.  (Pet.'s 56.1 Resp. ¶ 4.)  It is undisputed that Respondent's parents own the house since at least 2013.  (Resp.'s 56.1 ¶ 4; Pet.'s 56.1 Resp. ¶ 4.)

Respondent's parents are employed full time and support Respondent and the child. (Resp.'s. 56.1 ¶ 20; B. Jimenez Decl. ¶¶ 3-5.)  Respondent's mother has indicated that she and Respondent's father are willing to support Respondent and the child for as long as necessary.  (*Id.*) Additionally, Respondent's mother states that Respondent and the child are welcome to live with the family for as long as they would like.  (Resp.'s 56.1 ¶ 4.)  The child is covered by health insurance, and, in his most recent medical examination, the treating physician assessed the child as healthy.  (Resp.'s. 56.1 ¶ 16; Ex. 21 to the Jimenez Decl., Dkt. Entry No. 35-4.)  Both parties agree that Respondent is a good mother.  (Resp.'s. 56.1 ¶ 18; Pet.'s 56.1 Resp. ¶ 18.)

The child's regular interactions with about thirty (30) extended family members in New York City and the surrounding region include playing with and being around other children in the

---

[2] A.J. is fifteen years old and was born and raised in New York.

family.  (Resp.'s 56.1 ¶ 7; Jimenez Decl. ¶¶ 27-33.)  The child has a loving family relationship with his maternal grandparents, aunt, and great uncle Sergio.  (Resp.'s 56.1 ¶ 5.)  The child's maternal grandfather recently taught him how to ride a two-wheeled bicycle, and his grandfather and great uncle Sergio enjoy teaching him things, such as how to use tools.  (B. Jimenez Decl. ¶¶ 7-9.)  His maternal aunt A.J. reads to the child, takes him to the park, and helps him with his schoolwork.  (Declaration of A.J., dated June 30, 2016 ("A.J. Decl.") ¶¶ 4-5, Dkt. Entry No. 35-7.)  A.J. has indicated that, when she turns 21 years old in 2022, she would be "very happy" to sponsor Respondent and the child for permanent residence in the United States.  (*Id.* ¶ 3.)  The child also is very attached to Lucas the family dog, who was adopted in May 2014.  (Resp.'s 56.1 ¶ 6; Pet.'s 56.1 Resp. ¶ 6.)  Along with family on his mother's side, Petitioner's paternal aunt and two maternal cousins also reside in New York.  (Pet.'s 56.1 Resp. ¶ 8; Resp.'s 56.1 ¶ 8.)  The record is silent as to the level of interaction, if any, between the child and his paternal relatives in New York.

Aside from spending time with family, the child interacts with other children from the neighborhood.  (Resp.'s 56.1 ¶¶ 9-10.)  The children attend each other's birthday parties and some of the children participate in a Tae Kwon Do afterschool program with the child.  (*Id.*; Jimenez Decl. ¶ 41.)  The child attends the Tae Kwon Do program four to five times per week and has participated in several tournaments.  (*Id.*)  His instructor states that the child has "made real progress this year" and has "performed extremely well" in tournaments.  (Declaration of Yoan Medrano, dated June 30, 2016 ("Medrano Decl.") ¶¶ 5-6, Dkt. Entry No. 35-11.)  Additionally, he notes that, when "competing against his friends, [the child] consistently displays good sportsmanship."  (*Id.*)  The child and Respondent also attend church services, and the child expects to make his First Communion next year.  (Resp.'s 56.1 ¶ 11.)

During the 2013-2014 school year, Petitioner enrolled the child in a nursery school program at the YMCA two days per week. (Jimenez Decl. ¶ 18.) Recently, the child completed kindergarten at Achievement First Apollo Elementary School. (Resp.'s 56.1 ¶¶ 12-13.) This marked the child's third year of school in New York. (*Id.*) In the fall, the child will continue his studies at Apollo. (*Id.*) The child's primary language is now English. (*Id.* ¶ 15.) In September 2015, the child received a score of "Expanding" on his English language proficiency examination, which meant that the child was approaching English language proficiency within his grade level. (Declaration of Rebecca Bays, dated June 30, 2016 ("Bays Decl.") ¶ 8, Dkt. Entry No. 35-9.)

This past academic year, the child received special education services because he was diagnosed with a learning disability and speech and language impairment by healthcare professionals associated with the school's Committee on Preschool Special Education. (Resp.'s 56.1 ¶ 14; Ex 1 to Bays Decl., Dkt. Entry No. 35-10.) The special education services included thirty-minute speech-language therapy sessions twice a week, guided reading instruction, and enrollment in a supplementary reading and writing program. (Bays Decl. ¶¶ 5-6.) The child also received English Language Learning ("ELL") support. (Bays Decl. ¶ 4.) He met individually with an instructor and practiced English for forty-five-minute sessions twice a week. (*Id.* ¶ 7.) His ELL progress evaluations improved from "Partial Progress" to "Substantial Progress," and his most recent evaluation stated that he, "has tremendously improved" in his ability to recognize letters and sounds. (*Id.* ¶ 7.) Overall, although struggling with reading, the child's grade report shows that he is performing well in school. (*Id.* ¶ 9; Ex. 7 to Bays Decl., Grade Report, dated 2015-2016; 2015-2016 Grade Report ("Grade Report"), Dkt. Entry No. 35-10.)

In a report of a psychiatric evaluation of the child, dated February 15, 2016, Dr. Stephanie Brandt concluded that, "It is entirely obvious that this rather fragile little boy is in fact happy and

thriving in every way." (Resp.'s. 56.1 ¶ 24; Ex. 2 to the Yablonski Decl., Child Psychiatric Evaluation of Stephanie Brandt, M.D., ("Brandt Evaluation"), at 14, Dkt. Entry No. 35-14.) Dr. Brandt also noted that, the child "is in fact quite disabled" and further concluded that, "it is my unequivocal professional opinion that the Child is a 'settled' child in his current New York home environment." (*Id.* at 14-15.) Dr. Brandt based her conclusions on various meetings with Respondent and the child, and on a review of the child's school and health documents. (*Id.* at 2.) Dr. Brandt also observed the child's interactions with his mother, maternal aunt, and cousin. (*Id.* at 14.) She concluded that these interactions demonstrated that the child had "deep attachments to his mother" and to the "various members of his extended family with whom he lives." (*Id.*)

Petitioner disputes the extent of the child's learning disability by offering a forensic psychosocial report by Dr. Mark S. Silver. (Pet.'s 56.1 Resp. ¶ 14; Ex. 7 to the Declaration of Sean Wright, Dr. Silver Child Psychiatric Evaluation ("Silver Evaluation"), Dkt. Entry No. 37-7.) In his evaluation, Dr. Silver, a New York State Licensed Clinical Social Worker, concluded that, "the child's overall health and well-being" may be affected by Respondent's "history of erratic behavior, emotional instability, or bizarre conduct." (*Id.*, at 19.) Dr. Silver based his conclusions on conversations he had with Petitioner and Petitioner's father, photographs of Petitioner and the child, and on his review of a video of the child interacting with Petitioner. (*Id.*, at 2.) In reaching his conclusions, Dr. Silver did not review any documents pertaining to the child's health and schooling, or meet with either Respondent or the child. (*Id.*, at 2, 19.) Nonetheless, it is undisputed that the child does have a learning disability and that, during the next school year, he will continue to receive tailored special education services. (Resp.'s. 56.1 ¶ 14; Bays Decl. ¶ 11; Silver Evaluation, at 19-21.)

In his evaluation, Dr. Silver reviewed Dr. Brandt's evaluation and disagreed with her conclusion that the child was "settled in his current New York home environment." (*Id.* at 14-15.) Dr. Silver believed that Dr. Brandt could "have arrived at the opposite conclusion given the evidence" that the child "endures (1) 'damage,' (2) he is 'disabled,' and (3) that he appears to suffer from serious developmental disabilities." (Silver Evaluation, at 19.) Based on this, Dr. Silver concluded that it "seems that such a child is not settled at all." (*Id.*) Additionally, Dr. Silver disagreed with Dr. Brandt's assessment of the child's disability because Dr. Brandt's evaluation did not "draw any clear conclusions to explain [the child's] mental health and/ or developmental issues." (Silver Evaluation, at 20.)

Since the child arrived to New York, Respondent has not concealed the child's whereabouts from Petitioner. (Resp.'s. 56.1 ¶ 29; Pet.'s 56.1 Resp. ¶ 29.) In fact, during the fall of 2013, Respondent facilitated telephone and "FaceTime" calls between Petitioner and the child and sent Petitioner photos of the child. (*Id.* ¶ 17; Matute-Castro Dep. at 203:6-207:2.) Respondent believes the child should have a relationship with his father and has made efforts to maintain contact between the child and Petitioner. (Resp.'s. 56.1 ¶ 30; Pet.'s 56.1 Resp. ¶ 30.) The child communicates with Petitioner and Petitioner's parents by "FaceTime" once or twice per week through an iPad Petitioner bought for the child in April 2016. (Resp.'s. 56.1 ¶ 19; Pet.'s 56.1 Resp. ¶ 19.) It is undisputed that Respondent and his parents have the resources and ability to visit the child in New York. (Resp.'s. 56.1 ¶ 31; Pet.'s 56.1 Resp. ¶ 31.) Respondent asserts that the child no longer has significant connections to Ecuador. (Resp.'s. 56.1 ¶ 32.) Petitioner denies this because the child has Ecuadorian citizenship, and Petitioner, Petitioner's parents, and his extended family still reside in Ecuador. (Pet.'s 56.1 Resp. ¶ 31.)

# DISCUSSION

## I.     Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F. 3d 184, 202 (2d Cir. 2007) (internal quotations omitted).

A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F. 3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*) and *Ramseur v. Chase Manhattan Bank*, 865 F. 2d 460, 465 (2d Cir. 1989)). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the

absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted). The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256. The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan v. City of New York*, 996 F. 2d 522, 532-33 (2d Cir. 1993) (citations and internal quotations omitted). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F. 3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

## II.     Analysis

Petitioner alleges that Respondent wrongfully retained their child in New York at the end of a family vacation on August 19, 2013, and seeks the child's return to Ecuador. (*See generally* Pet.'s Mem; Pet. at 8.) In response, Respondent moves for summary judgment asserting that even if the child was wrongfully retained in New York, the Court nonetheless should deny the petition and not return the child to Ecuador because the "well settled" or "now settled" defense applies. (*See generally* Resp.'s Mem.)

### A.      The Hague Convention and the Now Settled Defense

The Hague Convention, to which both Ecuador and the United States are signatories, protects against both wrongful removal and wrongful retention of children from their habitual

residence.  *See* Hague Convention, art. 1(a);[3] *Abbott v. Abbott*, 560 U.S. 1, 8 (2010); *Ordonez v. Tacuri*, 2009 WL 2928903, at *2 (E.D.N.Y. Sept. 10, 2009).  The Convention ceases to apply when a child reaches the age of sixteen.  *See* Hague Convention, art. 4.  In 1988, the United States ratified the Hague Convention, and Congress implemented it that same year by passing ICARA.  *See* 22 U.S.C. § 9001 *et seq.*; *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1229 (2014).  ICARA permits "any person" to file a petition seeking return of a wrongfully removed or retained child to their habitual residence.  *See* 22 U.S.C. § 9003; *Abbott*, 560 U.S. at 9.

Under ICARA, the petitioner bears the burden of demonstrating by a preponderance of the evidence that the child's removal or retention was wrongful.  *See* 22 U.S.C. § 9003 (e)(1)(A); *Ermini v. Vittori*, 758 F.3d 153, 161 (2d Cir. 2014).  Article 3 of the Convention states that the removal or retention of a child is considered wrongful where:

> *a)* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and *b)* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3; *see also Abbott*, 560 U.S. at 8.  "If a parent establishes that the removal or retention was wrongful, the child is to be returned unless the defendant establishes one of four defenses."  *Ermini*, 758 F.3d at 161; *Mota v. Castillo*, 692 F.3d 108, 113 (2d Cir. 2012).  The four defenses are that: (1) repatriation would create a grave risk of physical or psychological harm to the child; (2) fundamental principles of human rights prevent the child's return; (3) the child is now settled in the new environment; and (4) the petitioner was not actually exercising custody rights at the time of the removal or retention, or had consented to the removal or retention.  *Ermini*,

---

[3] *See* Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, available at https://www.hcch.net/en/instruments/conventions/full-text/?cid=24.

758 F.3d at 161. The first two defenses must be established by clear and convincing evidence and the latter two by a preponderance of the evidence. *Id.*; *see also* 22 U.S.C. § 9003 (e)(2)(B); *Lozano*, 134 S. Ct. at 1229. A court must construe the four defenses narrowly. *Ermini*, 758 F.3d at 161

Of these defenses, only the "well settled" or "now settled" defense, in Article 12 of the Convention, has been asserted by Respondent. Article 12 provides that, where the petition is filed more than one year after the wrongful removal or retention, the Court, "shall order the return of the child, unless it is demonstrated that the child is now settled in its new environment." Hague Convention art. 12; *see also Lozano*, 134 S. Ct. at 1229; *Mota*, 692 F.3d at 117. Even where the defense is established, the Court still has discretion to order repatriation. *See Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir. 2001).

## 1. The Child Was Wrongfully Retained in the United States

The now settled defense only applies if the petitioner first demonstrates that the child was wrongfully removed or retained by a preponderance of the evidence. *See A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624, 630 (E.D.N.Y. 2012); *Radu v. Toader*, 805 F. Supp. 2d 1, 12 (E.D.N.Y. 2011), *aff'd*, 463 F. App'x 29 (2d Cir. 2012); *Ordonez*, 2009 WL 2928903, at *7 n. 9. To prevail, a petitioner must show that, "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130–31 (2d Cir. 2005).

Here, the parties agree that the child was wrongfully retained in New York at the end of the family vacation on August 19, 2013. (Resp.'s. 56.1 ¶ 1; Pet.'s 56.1 Resp. ¶ 1.) Accordingly, the Court need not reach this issue.

## 2. The Petition was Filed Over One Year After the Wrongful Retention

Once the petitioner demonstrates that the child was wrongfully removed or retained, the Court should order the return of the child, unless the respondent proves the now settled defense by a preponderance of the evidence. *See Lozano v. Alvarez*, 697 F.3d 41, 51 (2d Cir. 2012). To establish the defense, the respondent must demonstrate, "(1) that the return proceeding was commenced more than one year after the wrongful removal or retention, and (2) that the child 'is now settled in its new environment.'" *Mota*, 692 F.3d at 117 (quoting Hague Convention, art. 12); *see also Lozano*, 697 F.3d at 51. The return proceeding must be commenced in a court with jurisdiction "in the place where the child is located at the time the petition is filed." 22 U.S.C. §§ 9003 (b), (f)(3). Thus, "any requests or filings made in the home country to have the child returned do not constitute 'commencement of proceedings.'" *In re R.V.B.*, 29 F. Supp.3d 243, 255 (E.D.N.Y. 2014). The one-year period "in Article 12 of the Hague Convention is not subject to equitable tolling." *Lozano*, 134 S. Ct. at 1236.

The parties agree that the wrongful retention of the child occurred on August 19, 2013, and that the petition was filed in this district, where the child is found, on August 5, 2015, almost two years later. (Resp.'s. 56.1 ¶¶ 1-2; Pet.'s 56.1 Resp. ¶¶ 1- 2.) Accordingly, the petition is untimely. Thus, the issue remaining before the court is whether the child is "now settled in its new environment." Hague Convention, art. 12; *Kosewski v. Michalowska*, 2015 WL 5999389, at *21 (E.D.N.Y. Oct. 14, 2015); *In re R.V.B.*, 29 F. Supp. 3d at 256.

## 3. The Child is Settled in New York

While neither The Hague Convention nor ICARA define the word "settled," the Second Circuit has held that it "should be viewed to mean that the child has significant emotional and physical connections demonstrating security, stability, and permanence in its new environment."

*Lozano*, 697 F.3d at 56.   When determining if a child is "now settled," the court may consider

"any factor relevant to a child's connection to his living arrangement."   *Id.*  Among the factors the

court should consider are:

> (1) the age of the child; (2) the stability of the child's residence in the new
> environment; (3) whether the child attends school or day care consistently;
> (4) whether the child attends church [or participates in other community or
> extracurricular school activities] regularly; (5) the respondent's employment
> and financial stability; (6) whether the child has friends and relatives in the
> new area; and (7) the immigration status of the child and the respondent.

*Id.* at 57 (citing *Duarte v. Bardales,* 526 F.3d 563, 576 (9th Cir. 2008).  A court should examine

the child's present circumstances and assess whether a child is "now settled" as of the date of either

an evidentiary hearing or when a motion for summary judgment is filed.  *See Gwiazdowski v.*

*Gwiazdowska*, 2015 WL 1514436, at *4 (E.D.N.Y. Apr. 3, 2015) (evaluating factors at time of

evidentiary hearing); *In re D.T.J.*, 956 F. Supp. 2d 523, 534 (S.D.N.Y. 2013) (same); *Garza-*

*Castillo v. Guajardo-Ochoa*, 2012 WL 523696, at *5 n. 5 (D. Nev. Feb. 15, 2012); *Stevens v.*

*Stevens*, 499 F. Supp. 2d 891, 896 (E.D. Mich. 2007).  Based on the record in this case, the Court

concludes that the child is now settled in New York for purposes of Article 12 of the Convention.

### a.  Stability

This factor weighs in favor of the now settled defense.  Courts have noted that "[t]he

stability of a child's residence 'plays a significant role in the settled inquiry.'"  *Gwiazdowski*, 2015

WL 1514436, at *4 (internal citation omitted).  The parties do not dispute that the child has resided

in the same household since his arrival to the United States, and that the home currently is owned

by his maternal grandparents.  (Resp.'s. 56.1 ¶¶ 3-4; Pet.'s 56.1 Resp. ¶¶ 3-4.)  In the home,

Respondent and the child have their own room, and the child's grandmother has declared that

Respondent and the child may stay in the home for as long as they would like.  (Jimenez Decl. ¶

24; B. Jimenez Decl. ¶ 5.)

Aside from having a stable home in which to live, this fall the child will return to the same school where he was enrolled last year and will continue to receive speech-language therapy and individualized attention from the school instructors. (Bays Decl. ¶ 11.) The child also has a relationship with all the family members that reside in the home and each member has spent time bonding with the child. (B. Jimenez Decl. ¶¶ 6-9.; A.J. Decl. ¶¶ 4-5.) All of this evidence shows that the child has a stable household. *See Taveras v. Morales*, 22 F. Supp.3d 219, 237 (S.D.N.Y. 2014), *aff'd sub nom. Taveras ex rel. L.A.H. v. Morales*, 604 F. App'x 55 (2d Cir. 2015); *In re D.T.J.*, 956 F. Supp.2d at 534-535.

Petitioner's feeble attempt to counter Respondent's overwhelming evidence demonstrating stability by pointing to one single statement in Dr. Brandt's evaluation where Respondent reported that, after meeting with Petitioner, the child told her, "I don't like you, I hate you, I don't want to be here and I hate grandma," is unavailing. (Brandt Evaluation, at 8.) Significantly, Dr. Brandt's evaluation also notes that, later in the day, the child apologized and she concluded that the child "is cared for … by a large and loving extended family." (*Id.* at 8, 14) The single statement relied on by Petitioner is insufficient to counter the overwhelming evidence presented by Respondent that the child has a stable residence and overall stable living environment in New York. Thus, this factor strongly favors a finding that the child is now settled.

### b. The Child's School Attendance

The evidence establishes that this factor also firmly supports the now settled defense. The undisputed evidence shows that the child has completed three years of school in New York, will continue to attend the same school in the fall, graduated pre-k in 2015, just completed kindergarten, and received speech-language therapy, guided reading instruction, and ELL support, while in school this past year. (Bays Decl. ¶ 4.) The evidence also shows that, as part of the ELL program,

the child practiced English for forty-five-minute sessions twice per week, and his most recent ELL evaluation stated that he "has tremendously improved" in his ability to recognize letters and sounds. (*Id.* ¶ 7.) Additionally, the child's grade report notes that he generally is performing well in his classes. (*Id.* ¶ 9; Grade Report.) Although the child is struggling with reading, his instructor states that the child "continues to work hard." (Grade Report, at 2.) The evidence squarely shows that this factor weighs in favor of finding that the child is now settled.

Petitioner has not provided any evidence disputing the child's progress or adjustment to school in New York. Instead, Petitioner asserts that there is a genuine issue of material fact concerning the extent of the child's learning disability relying on Dr. Silver's forensic psychosocial report. Dr. Silver's report speculates as to how Respondent's mental health might affect the child's learning disability, challenges Dr. Brandt's conclusions as to the child's developmental issues and that the child is settled in New York. (Silver Evaluation, at 19.) However, Dr. Silver's report is not based on any actual in person examination of the child, or on a review of the child's school or medical records. (Silver Evaluation, at 2.) Instead, his findings are based on biased representations made by Petitioner and Petitioner's father, a review of some photographs, and a video of the child's interactions with Petitioner. (Silver Evaluation, at 2.) Notably, however, as Respondent correctly points out, Dr. Silver apparently accepts the fact that the child has a learning disability and does not dispute that the child is progressing in school. (Silver Evaluation, at 19-20.) As such, the Court finds Dr. Silver's conclusions and recommendations flawed.

Finally, whether the child has a learning disability is not dispositive of the issue, by itself. What is critical to the Court's determination are the extensive steps taken by Respondent and the school to address the child's learning disability and the fact that he is thriving and doing well in school despite his learning disability. Notably, notwithstanding any learning disability, the child

socializes properly with other children his age and has a positive relationship with multiple family members. Petitioner offers no evidence to demonstrate how the extent of the child's learning disability affects whether the child is now settled in New York. Where, as here, a child is performing well in school, progressing in his courses, and appears to be well adjusted in his social interactions with fellow students, courts have routinely found that this factor supports the now settled defense. *See Gwiazdowski*, 2015 WL 1514436, at *4; *Taveras v. Morales*, 22 F. Supp. 3d at 237.

### c. The Child Attends Church and Participates in Other Extracurricular Activities

Respondent's undisputed evidence demonstrates that the child attends church, is preparing for his First Communion, and participates in a Tae Kwon Do program after school four to five days per week. (Jimenez Decl. ¶ 42; Medrano Decl. ¶ 3.) His Tae Kwon Do instructor notes that the child, "has made real progress this year" and "won second place in a tournament after competing against a more advanced student." (Medrano Decl. ¶ 6.) Soon, the child also will take his second promotion test to advance from a "while/yellow belt to a yellow belt." (*Id.* ¶ 5.) This factor weighs in favor of finding that the child is now settled.

### d. Respondent's Employment and Financial Stability

Petitioner devotes the majority of his opposition to arguing that the child is not settled because Respondent is not financially stable. First, Petitioner argues that Respondent's inability to work pursuant to her F-1 status tilts this factor against the now settled defense. (Pet.'s Mem. at 6.) The Court disagrees and finds that this factor supports the now settled defense.

Courts have held that financial support from other sources may either support the now settled defense, diminish the weight given to this factor, or make the factor inconclusive in the court's analysis. *See Kosewski*, 2015 WL 5999389, at *22 (considering stable employment of

Respondent's partner in the now settled analysis); *Gwiazdowski*, 2015 WL 1514436, at *4; *In re D.T.J.*, 956 F. Supp.2d at 537; *In re Lozano*, 809 F. Supp.2d 197, 231-32 (S.D.N.Y. 2011); *Matovski v. Matovski*, 2007 WL 2600862, at *14 (S.D.N.Y. Aug. 31, 2007).

Here, Respondent's diminished prospects of attaining future employment while possessing F-1 status does not weigh against finding that this factor supports the now settled defense. The undisputed evidence demonstrates that the child and Respondent currently are supported by Respondent's parents, the income is sufficient to support the entire household, and that Respondent receives child support from Petitioner. Significantly, the principal focus of the Court's inquiry is whether the child is *now* settled and there is no evidence to "suggest that the financial and other support that the child and Respondent are receiving … is in jeopardy, or is unlikely to continue for the foreseeable future." *In re Lozano*, 809 F. Supp.2d at 232. To the contrary, Respondent's mother states that, "[the family is] willing and able to continue to support [Respondent and the child] for as long as necessary." (B. Jimenez Decl. ¶ 5.) Given this stable and substantial support from other sources, Respondent's current inability to work does not support the conclusion that this factor weighs against finding that the child is settled. *See Matovski*, 2007 WL 2600862, at *14.

Second, Petitioner asserts that Respondent's legal representation by *pro bono* counsel further undermines Respondent's financial stability. (Pet.'s Mem. at 7.) Petitioner's argument is meritless and carries no weight in the Court's analysis because Respondent's financial stability simply does not depend on her ability to afford legal representation. *See Taveras*, 22 F. Supp.3d at 238 (Respondent who made $15 an hour was financially stable although represented by *pro bono* counsel). Instead, this factor focuses on whether the child's basic needs are met, which is undisputed here, and not on the amount of household income. *See Id.*; *In re Lozano*, 809 F. Supp.2d at 232. A finding that representation by *pro bono* counsel cuts against the now settled

defense may leave many otherwise financially stable low income individuals to fend for themselves when faced with a petition under the Convention. Such a repercussion is not supported by either the Convention, its goals, due process, or the law in this Circuit.

Petitioner's final argument against Respondent's financial stability centers on the date when Respondent's parents purchased the home Respondent and the child currently reside in. (Pet.'s Mem. at 6.) When the home was purchased is immaterial because there is no dispute that Respondent's parents currently own the home. Thus, the family's present financial situation is not impacted by the fact that Respondent's parents may not have purchased the home on the exact date stated by Respondent. This factual dispute does not alter the result.

### e. The Child Has Friends and Relatives in New York

This factor weighs heavily in favor of the now settled defense. Respondent has presented overwhelming evidence demonstrating that the child has multiple friends in his new neighborhood and interacts with them regularly. For instance, the child attends birthday parties for neighborhood kids and has "several friends in the [Tae Kwon Do] program, who are all neighborhood children." (Medrano Decl. ¶ 8; Jimenez Decl. ¶¶ 35-41.) Significantly, the child has a loving and happy relationship with all the relatives that reside in his household and they "generally have dinner together at a restaurant every Friday night." (B. Jimenez Decl. ¶¶ 6-9.)[4] The undisputed evidence also establishes that the child has family in the area that he interacts with regularly. (Resp.'s 56.1 ¶ 7.) In addition, the child has paternal family in the New York area. (Resp.'s 56.1 ¶ 8; Pet.'s 56.1

---

[4] Petitioner disputes Respondent's showing that the child has a happy and loving family relationship with his family members by asserting that "these are subjective statements that are inadequately supported by the selected exhibits." (Pet.'s 56.1 Resp. ¶ 5.) However, as Respondent correctly notes, this is insufficient to defeat the properly supported summary judgment motion. Petitioner has failed to offer any evidence at all to dispute these facts. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

Resp. ¶ 8.)  Based on the substantial undisputed evidence in support of this factor, it strongly supports the now settled defense.  *See Matovski*, 2007 WL 2600862, at *14.

### f.   The Immigration Status of the Child and Respondent

The Second Circuit has held that, "[t]he importance of a child's immigration status will inevitably vary for innumerable reasons, including: the likelihood that the child will be able to acquire legal status or otherwise remain in the United States, the child's age, and the extent to which the child will be harmed by her inability to receive certain government benefits."  *Lozano*, 697 F.3d 41, 57 (2d Cir. 2012).  Thus, "immigration status should only be one of many factors courts take into account when deciding if a child is settled within the meaning of Article 12," *Id.*, and it should not be dispositive.  *Broca v. Giron*, 530 F. App'x 46, 47 (2d Cir. 2013) (Summary Order) ("The test is a 'fact-specific multi-factor' test, in which no factor, including immigration status, is dispositive.").

Respondent and the child hold F-1 status, which allows them to remain lawfully in the United States while Respondent is in school.  The fact that Respondent and the child are "here legally is a positive factor in the [now] 'settled' analysis."  *Gwiazdowski*, 2015 WL 1514436, at *5.  While Respondent's F-1 status is not permanent, the Court accords this factor little weight in its analysis.  Here, Respondent and the child currently have lawful immigration status that is not presently affecting the child's ability to adjust to his environment, his stability in that environment, and there is no evidence that he is inhibited from receiving any government benefits.  Thus, there is no need to accord this factor significant weight.  *See Lozano*, 697 F.3d at 56 (holding that "in any given case, the weight to be ascribed to a child's immigration status will necessarily vary").

The Court's conclusion is not altered by Respondent's proposed path to permanent lawful status.  Currently, Respondent's course revolves around her younger sister A.J., who is a fifteen-

year-old United States citizen.  (Pl.'s Mem. at 22; A.J. Decl. ¶ 3.)[5]  According to Respondent, once A.J. reaches the age of 21, she could sponsor Respondent for permanent residence, and, as a result, the child could attain derivative status.  Since this could not occur until at least 2022, when A.J. turns 21, this possible path to future lawful immigration status does not carry any weight in the Court's analysis, but it is insufficient to rebut the Court's finding that the child is now settled.

### g.  Age of the Child

M.M.J. is six years old.  He has spent half of his life in New York living in the same home with his mother, maternal aunt, grandparents, and great uncle.  The documentary evidence demonstrates that, during his three years in New York, he has attended school, after school activities, church, and engaged in organized athletic activities.  (Jimenez Decl. ¶¶ 35-40; Medrano Decl. ¶ 8.)  He regularly interacts with other similarly aged children, both within his family and in the community, in competitive and non-competitive environments outside of school.  (Jimenez Decl. ¶¶ 35-40.)  Additionally, his increasing ability to express himself in English is evidence that he continues to develop a meaningful connection to the United States.  (Jimenez Decl. ¶¶ 48; Medrano Decl. ¶ 8; Matute-Castro Dep. at 214:2-6; Bays Decl. ¶ 8.)  Significantly, Petitioner has presented no evidence to suggest that the child's age limits his ability to develop meaningful connections, or favors his return to Ecuador.  The undisputed evidence demonstrates, and the Court finds, that the six-year-old child "is old enough to have developed meaningful connections to the United States such that [he] is [now settled] here."  *Kosewski*, 2015 WL 5999389, at *22.  Thus, the Court finds that this factor strongly supports the now settled defense.  *See In re Robinson*, 983

---

[5]  As Respondent correctly notes, she may also attain lawful status by marrying a United States citizen or permanent resident.  However, this is too speculative to change the outcome of this factor, specifically because Respondent indicated to Dr. Brandt that, "she is not dating and has no interest in this right now."  (Brandt Evaluation, at 8.)

F. Supp. 1339, 1345 (D.Colo.1997) (concluding that six–year–old is "old enough to allow meaningful connections to the new environment to evolve").

Balancing the forgoing factors, the Court concludes that the undisputed evidence overwhelmingly establishes that Respondent has met her burden of demonstrating by a preponderance of the evidence that the child is now settled in New York. Evidence establishing six of the seven factors overwhelmingly supports the now settled defense, and there is ample undisputed evidence supporting this conclusion. The remaining factor deserves little weight in the Court's analysis. However, even if the Court accorded this factor equal weight, it would not alter the result. Although the child may not have permanent lawful status in the future, the child is healthy, progressing in school, learning English, consistently interacting with other children and family, developing relationships, financially supported by his grandparents, and enjoying a stable home. M.M.J. is now settled in New York under Article 12 of the Convention.

**B.      The Court Will Not Exercise its Discretion and Order the Child's Return**

Even where a party establishes that the child is now settled, a Court may still order the return of the child. *See Blondin v. Dubois*, 238 F.3d 153, 164 (2d Cir. 2001). The Court declines to exercise its discretion and return the child to Ecuador. The evidence that M.M.J. is thriving and settled in New York is compelling. Additionally, the undisputed evidence establishes that Respondent did not conceal the child's whereabouts or remove the child in order to gain an advantage in a custody dispute and makes efforts to maintain contact between Petitioner and the child. *See Gwiazdowski*, 2015 WL 1514436, at *5; *Taveras*, 22 F. Supp.3d at 240. The Court sees no reason to uproot a prospering six-year-old boy from the home where he has spent half his life, or how doing so could further the goals of the Convention.

In sum, taking the record as a whole, and drawing all inferences in the light most favorable to the non-moving party, Petitioner has failed to raise any genuine issue of material fact that might cause a rational trier of fact to find in his favor. Accordingly, Respondent's motion for summary judgment is granted, and the Petition is dismissed.

## **CONCLUSION**

For the reasons set forth above, Respondent's motion is granted in its entirety, and the Petition is denied.

SO ORDERED.

Dated: Brooklyn, New York
      August 26, 2016

_____/s/_____
DORA L. IRIZARRY
Chief Judge
